```
 1              UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF WEST VIRGINIA

 3   Diana Mey,
     on behalf of herself
 4   and a class of others
     similarly situated,

 5

 6        Plaintiffs,

 7             VS.                  CIVIL ACTION NO.

 8                                  5:24-cv-55

 9   William Pintas,
     P&M Law Firm, LLC, et al.,
10        Defendants.

11                      - - -

12        Proceedings had in the hearing for preliminary injunction
     in the above-styled action on May 13, 2024, before Honorable
13   John Preston Bailey, District Judge, at Wheeling, West
     Virginia.
14                      - - -

15        APPEARANCES:

16        On behalf of the Plaintiffs:

17        Ryan McCune Donovan
          Hissam, Forman, Donovan & Ritchie, PLLC
18        707 Virginia Street, East, Suite 260
          Charleston, WV  25301
19        681.265.3802

20        On behalf of defendants William Pintas and P&M Law Firm,

21   LLC:

22        Jared M. Tully
          Blake N. Humphrey
23        Frost, Brown, Todd, LLP
          500 Virginia Street, East, Suite 1100
24        Charleston, WV  25301
          304.348.2413
25   APPEARANCES CONTINUED ON NEXT PAGE
```

```
 1        On behalf of defendants William Pintas and P&M Law Firm,

 2   LLC (continued):

 3        Jeffrey Gilbert
          Greenspoon Marder, LLC
 4        600 Brickell Avenue, 36th Floor
          Miami, FL  33131
 5        305.789.26761

 6        On behalf of defendant P&M Law Firm (PR), LLC:

 7        Carlos Baralt Suarez
          Baralt Law, LLC
 8        PO Box 190751
          San Juan, PR  00919
 9        939.625.3712

10

11

12

13        Proceedings recorded utilizing realtime translation.
          Transcript produced by computer-aided transcription.
14

15

16

17

18

19

20

21

22

23

24

25
```

1                          Monday Morning Session,

2                          May 13, 2024, 10:00 a.m.

3                    - - -

4          THE COURT:  Ask the clerk to call the case, please.

5          THE CLERK:  This is the case of Diana Mey versus

6    William Pintas, et al., Civil Action Number 5:24-CV-55.

7          Will the parties please note their appearance for the

8    record.

9          MR. DONOVAN:  Ryan Donovan, Your Honor, on behalf of

10   the plaintiff, Diana Mey, who's present in the courtroom today.

11         MR. GILBERT:  Good morning, Your Honor.  Jeffrey

12   Gilbert, Carlos Baralt, Jared Tulley, and Blake Humphrey for

13   the defendants.

14         THE COURT:  All right.  We are here for a hearing on

15   a preliminary injunction.  I have a whole pile of affidavits,

16   declarations.  Does any party wish to call witnesses to

17   supplement or contest what's in the affidavits, or present any

18   other testimony?

19         Mr. Donovan, start with you.

20         MR. DONOVAN:  Your Honor, I don't intend to call any

21   witnesses at this time, pending anything that may be raised by

22   the Pintas defendants.  I did want to submit two additional

23   pieces of evidence to the Court.  One that we referenced in our

24   brief filed last week were recordings of the calls at issue in

25   this case.  They're difficult to submit electronically, and so

1    I thought it would be easier to simply bring those with us

2    today.  We can handle these with the clerk after the hearing,

3    if that's what you prefer.

4              THE COURT:  All right.  That's fine.

5              MR. DONOVAN:  I was also made aware that there was an

6    issue with the exhibit that we filed to our reply this morning.

7    It was a PDF from the Puerto Rican court, and for technical

8    reasons that I don't understand, frankly, it was accepted by

9    the ECF system, but I think it was blank, so we did bring a

10   copy of that that we would submit to the Court, just so that

11   you have that in front of you today.

12             THE COURT:  Have you received it?

13             MR. GILBERT:  We received it just now, Your Honor.

14   Mr. Baralt can speak more directly to it, but the one that's

15   filed in the Puerto Rican court is signed by counsel, not only

16   for the plaintiffs in Puerto Rico, but also the defendant in

17   Puerto Rico, with our lawyers from Puerto Rico signing off on

18   it, and then the Puerto Rican judge, the court in Puerto Rico,

19   signing an order scheduling the initial scheduling conference.

20   Is that correct?

21             MR. BARALT:  This is the memorandum that the parties

22   submit jointly to the court before the initial scheduling

23   conference, and based on the proposal for discovery the parties

24   submit jointly, the Court entered the case management order.

25   This, I believe, is the last draft that we exchanged.  It's not

1   signed by her attorneys in Puerto Rico, and it's not time

2   stamped by the Court, but I don't have any reason to think that

3   it's different from the last version that we exchanged.

4           MR. GILBERT:  But the one that is filed in

5   Puerto Rico obviously is signed off on by all counsel in

6   Puerto Rico and approved by the judge, who issued an order

7   based upon that report in Puerto Rico.

8           MR. DONOVAN:  Your Honor, I'm obviously limited to a

9   great extent in what I can understand about what's happening on

10  the Puerto Rican docket.  This is submitted simply in support

11  of an argument regarding whether or not the deposition that

12  they seek to take of me is --

13          THE COURT:  Bring it up.

14          MR. DONOVAN:  Thank you, Your Honor.  We'll file it

15  as an exhibit, Exhibit 1, for today.

16          MR. GILBERT:  Judge, in response to your question, we

17  do rely on the declarations and affidavits that are filed, and

18  submit them as evidence for today, obviously.  Mr. Baralt and I

19  will be arguing, so any specific questions that you may have,

20  if we get into any questions about particular proceedings in

21  Puerto Rico, Mr. Baralt will be addressing that.  We can treat

22  it as evidence or whatnot, but I'm not planning to call him as

23  a witness.

24          MR. DONOVAN:  I simply have some concern, Your Honor,

25  with drawing a line between what's the testimony of Mr. Baralt,

1    if he does submit it, and what is the unsworn statement of

2    counsel making an argument.  So I would prefer that he either

3    be a witness or an advocate, if that's okay with my opposing

4    counsel.

5            THE COURT:  Is there something that's not in the

6    declarations?

7            MR. GILBERT:  We believe that everything is in the

8    declarations, but if there's any questions that you may have

9    that you want to clarify, we will do our best, obviously, to

10   clarify that for you.

11           THE COURT:  All right.  Part of the fun I had over

12   the weekend was reading all this stuff.  I can get it -- my one

13   law clerk has shown me how I can get it onto my iPad now, so

14   I've read everything.  I think I understand your positions, but

15   we'll start with Mr. Donovan, since the burden is on you.

16   Anything you want to add to what's in your memorandum?

17           MR. DONOVAN:  Your Honor, I think we're fairly

18   comfortable standing with what's in our memorandum and our

19   reply brief filed this morning.  This is straightforward.

20   Ms. Mey sent a demand, as she does, rather than litigating the

21   case or even responding, and while pretending to engage in a

22   good-faith negotiation, Mr. Pintas went off, filed this suit

23   that is absolutely without basis.

24           And I do want to focus on that, and that is the one

25   thing I want to draw the Court's attention to, the distinction

1  between the injunction we're seeking and the injunctions --

2  some injunctions that the defendants have cited that have been

3  denied or reversed, are that this is not just a matter of us

4  trying to cut off parallel litigation.  This is an absolutely

5  blatantly vexatious suit.  The evidence we've submitted makes

6  clear that Ms. Mey received calls on February 8, 2023, prior to

7  her having any communication whatsoever with the Pintas

8  defendants.

9          Mr. Pintas went off, filed a lawsuit in Puerto Rico

10  that omitted that information, knowingly omitted that

11  information, then engaged in all sorts of underhanded

12  procedural tactics that we discussed at the last hearing and

13  are well reflected in our papers and has caused Ms. Mey to

14  spend upwards of $60,000 out of pocket defending herself.

15          More importantly, the suit in Puerto Rico, in

16  addition to being vexatious, is by intent designed to interfere

17  with this Court's authority to resolve her federal claims.  The

18  statement was made in Pintas's brief that we were asking for a

19  fourth exception to the Anti-Injunction Act.  That's not the

20  case at all.  The exception we're going under is the

21  in-aid-of-jurisdiction exception.  It allows the Court to

22  enjoin state court litigation that interferes with the Court's

23  authority and flexibility to resolve a federal claim.

24          The significance of the vexatious nature of the

25  lawsuit is not that we're asking for some additional exception;

1   it's that there could be no dispute that this lawsuit

2   interferes with this Court's authority and flexibility to

3   resolve her federal claims.  Some courts have declined to enter

4   injunctions under those circumstances in deference to comity;

5   to say, hey, we're not going to step on the toes of the state

6   court when they've got valid litigation in front of them that

7   they're trying to resolve.

8          But that narrow construction of this exception in

9   deference to comity goes completely out the window when you

10  have a lawsuit like this that is without jurisdiction, without

11  foundation, and without factual support, that is, and

12  engaging -- in which one of the parties has engaged in so much

13  jurisdictional procedural tomfoolery for the express purpose of

14  harming Ms. Mey.

15         So we believe this pretty clearly falls under the

16  Court's authority to issue this injunction.  We do, again,

17  emphasize that despite the 40 pages of briefing that has come

18  in over the last week or so, I have yet to see any response

19  whatsoever to the evidence regarding these February 8 calls and

20  the impact that has on the case, and I look forward to seeing

21  what my opposing counsel has to say about it today.

22         THE COURT:  Mr. Gilbert.

23         MR. GILBERT:  Thank you.  If I may respond briefly to

24  what Mr. Donovan just said, and then obviously I have argument,

25  if the Court will take it.

```
1              Obviously, we believe that the Anti-Injunction Act
2    does not apply, that it has to be read extremely narrowly, that
3    the fact that there is a state court case going on at the same
4    time that there is a federal court case going on, or the fact
5    that the state court case in Puerto Rico started more than a
6    week before the federal court filed goes against everything
7    that Mr. Donovan just said, because he said that the court case
8    in Puerto Rico, by intent, was designed to interfere with the
9    federal claim.  The action was filed more than a year before
10   any action was filed here.
11             THE COURT:  You say a year, but how long was it until
12   Ms. Mey found out about it?
13             MR. GILBERT:  She found out about it right away when
14   it was filed, Judge, because we have the -- we had -- this was
15   not raised at the temporary restraining order hearing.  An
16   in-person process server here in Wheeling, West Virginia, on
17   four separate days, April 6th of this year -- I'm sorry, April
18   6th, 2023, April 7, 2023, April 8, 2023, and April 10, 2023, on
19   four separate days, made six attempts at her house, including,
20   on the first or second attempt, speaking with her husband, who
21   refused to accept service of the complaint.  In hindsight, the
22   process server should have just left it there and that would
23   have been the end of it.
24             But the bottom line, Judge, is the default was
25   vacated in Puerto Rico, so the issue on service is moot.
```

1   Concurrent jurisdiction exists.  This case can proceed here.

2   But there's absolutely, we believe, no power of the federal

3   court sitting here to stop a case, enjoin a Puerto Rican court

4   from proceeding with the litigation that has been proceeding

5   for now more than 13 or 14 months.

6           And what I'd like to do -- let me just finish

7   responding to him.  He raises all these issues about

8   Puerto Rico's without jurisdiction, the case is without

9   foundation, it's without factual support, there's tomfoolery

10  that is harming Ms. Mey, that it's vexatious.  Let the

11  Puerto Rico court decide it.  That's what the Puerto Rico court

12  is supposed to do.  That's the entire system that Congress set

13  up in 1789 and 1793 with the anti-injunction law, to allow it

14  to go forward.  We truly believe, Judge, that this Court

15  sitting here has absolutely no power whatsoever to enjoin and

16  stop the litigation that's pending in Puerto Rico.

17          And your temporary restraining order cites *Atlantic*

18  *Coastline Railroad*.  They cite *Atlantic Coastline Railroad*.  We

19  cite *Atlantic Coastline Railroad*.  Everybody is citing it, but,

20  Judge, if you really read the opinion -- and I'd like to spend

21  some time reading this US Court -- US Supreme Court opinion,

22  portions of it, because the injunction in this case was vacated

23  for the exact reasons why we believe that there should be no

24  injunction in this case.  And if you would indulge me, I would

25  just like to just point out some items that the Supreme Court

1    is talking about that we need to understand for the proceedings

2    here.

3              It says that the state court shall remain free from

4    interference by federal courts, and that has remained in time

5    from 1789 and 1793 through till today.  A court of the United

6    States may not grant an injunction to stay proceedings in a

7    state court except as expressly authorized by the act of

8    Congress or, where necessary, in aid of execution, or protect

9    or effectuate judgments.

10             And the progeny on the understanding of necessary in

11   aid of execution or to protect or effectuate its judgments,

12   they've read those two together because the instances where

13   it's jurisdiction necessary in aid is limited to either an in

14   rem case, where you don't want two courts fighting over a piece

15   of property -- and that is the *American Honda* case, and we can

16   go to that case next, because I want to address that case --

17   and whether to protect and effectuate judgments, which is also

18   the *American Honda* case, because in the *American Honda* case,

19   even though it says you can't have two courts simultaneously

20   fighting over in rem jurisdiction, what it also says is, on the

21   issue of taking away a federal court's jurisdiction really is

22   so that the federal court is unable to effectuate or protect

23   its judgments.

24             And if you take a close -- it's not even a close

25   reading.  If you take a reading of the *American Honda* case, in

1    that case you're talking about multidistrict litigation where

2    there was a settlement, with that federal court having

3    exclusive jurisdiction.  There was a settlement order on the

4    multidistrict litigation.  Some other party tried to disrupt

5    that in an arbitration or state court proceeding, and at that

6    point the court said, yes, we are going to enjoin that

7    proceeding because we are going to protect and effectuate a

8    judgment that has been put in place through MDL for the

9    settlement, and our order is in place.  None of that is the

10   case here.

11          Additionally, in *Atlantic Coast*, it says,

12   understandably, this dual-court system was bound to lead to

13   conflicts and frictions.  On the face of the act, it is an

14   absolute prohibition against enjoining state court proceedings

15   unless the injunction falls within one of the items, and they

16   say it's only the second item, which is necessary in aid of

17   execution.  And the Supreme Court says --

18          THE COURT:  In aid of jurisdiction.

19          MR. GILBERT:  In aid of jurisdiction, I apologize.

20          The argument implies that in certain circumstances

21   the federal court may enjoin state court proceedings even if

22   that action cannot be justified by any of the three exceptions,

23   and the Supreme Court says we cannot accept any such

24   contention.  Legislative policy is here expressed in a

25   clear-cut prohibition qualified only by specifically defined

1    exceptions.

2            And then it says the exception should not be enlarged

3    by loose statutory construction.  Proceedings in state court

4    should normally be allowed to continue unimpaired by

5    intervention of the lower federal courts, with relief from

6    error, if any, through the state appellate courts and

7    ultimately this Court.

8            I believe that the plaintiff is trying to incite fear

9    in this Court by saying that Puerto Rican -- the state court

10   proceedings in Puerto Rico are foreign; that they are conducted

11   in a foreign language; that it's in a far-flung jurisdiction.

12   The jurisdiction is three or four hours away from here by

13   plane.  Puerto Rico is sitting or presiding over this case as

14   if any other state, even a state court in Wheeling, West

15   Virginia, would be presiding over the case.

16           And if the case were even pending here or in Ohio or

17   in Pittsburgh or wherever the case may be, the federal court

18   and the state court would have concurrent jurisdiction.

19   According to the TCPA, it is not exclusive to be a claim only

20   decided by the federal courts.  State courts can decide the

21   TCPA claim.  Federal courts can.  It's concurrent jurisdiction.

22           And the Supreme Court continues:  First, a federal

23   court does not have inherent power to ignore the limitations of

24   the act and to enjoin state court proceedings merely because

25   those proceedings interfere with a protected federal right or

1   invade an area preempted by federal law even when the

2   interference is unmistakably clear.  We don't have that issue

3   here, because the state and federal courts, as I've said, have

4   concurrent jurisdiction over TCPA claims.

5          And then this is cited in our TR motion -- in your

6   TRO order, but I just wanted to expand on it.  Whatever the

7   doubts may be, we have strongly affect -- are strongly affected

8   by the general prohibition of the Anti-Injunction Act.  Any

9   doubts as to the propriety of a federal jurisdiction injunction

10  against state court proceedings should be resolved in favor of

11  permitting the state courts to proceed in an orderly fashion to

12  finally determine the controversy.  The explicit wording of

13  Section 2283 itself implies as much, and the fundamental

14  principle of a dual system of courts leads inevitably to that

15  conclusion.  So the injunction was vacated by the US Supreme

16  Court for all of those reasons in that opinion, and that is

17  what should be followed in this case.

18         Looking just quickly at the *American Honda* case,

19  where I did state that it was multidistrict litigation, there

20  the court was actually protecting and effectuating a judgment

21  that it had in place.  And obviously, we don't have that in

22  this case.  It does quote, the necessary in aid of its

23  jurisdiction exception to the Anti-Injunction Act is widely

24  understood to apply most often when a federal court was the

25  first in obtaining jurisdiction over a res or an in rem action

1    and the same federal court seeks to enjoin suits in state

2    courts involving the same res.

3           We do not have that here.  And this Court was decided

4    on the third prong, because it read the second prong -- the

5    second exception and the third exception as requiring the same

6    burden of proof on the plaintiff, and said that the way that

7    you would fall under the exception of the second prong was akin

8    to falling under the exception of the third prong, which is

9    where a court wants to protect and effectuate its judgments.

10          So that's the additional legal argument that I wanted

11   to provide to you.  But these claims of the lawsuit in

12   Puerto Rico being vexatious or far flung or in a remote

13   jurisdiction, none of that should be any consideration to this

14   Court, because this Court is not sitting in judgment of the

15   Puerto Rico court.  It's well established that lower federal

16   courts, the District Courts of the United States, do not have

17   jurisdiction over the state courts.  So this Court does not

18   have jurisdiction over the Puerto Rico court.

19          Let it all play out.  There's no reason why it can't

20   play out in Puerto Rico and play out here, if that be the case.

21   If they want to litigate here at the same time, let them

22   litigate here.  But the point is, Judge, that this case,

23   whether there's issues of fact or questions of law or whatever

24   the case may be in Puerto Rico, that is something for the

25   Puerto Rico court to decide.  One second.

1          So we have argued in our filing from Friday that the

2     Court should not enjoin the Puerto Rican court from -- in

3     accordance with the All Writs Act or the Anti-Injunction Act,

4     because neither statute permits that type of relief.  The

5     plaintiffs cannot show that there are circumstances that are

6     exigent or critical.  The plaintiff, who's the defendant in

7     Puerto Rico, has three lawyers from one firm representing her.

8     They've filed an answer.  They could have removed the case to

9     federal court if they wanted.  They could have filed, with

10    their answer, a compulsory claim alleging the claims that they

11    have alleged here.  They have not done any of that.

12          Any speculations and musings about what might happen

13    in discovery in Puerto Rico is insufficient to invoke the

14    Anti-Injunction Act.  There are no cases which says that a

15    federal court should enjoin a state court from any discovery

16    proceedings.  There's no cases that say anything like that.

17          And in addition, obviously, if the Court were to

18    enjoin the Puerto Rican court, then -- enjoin the parties from

19    proceeding in Puerto Rico, then we would request a substantial

20    bond.  The bond amount that we suggested was $130,000, which

21    was actually the $130,000 demand that the plaintiff made upon

22    the Puerto Rican case plaintiffs before the lawsuit was filed.

23          We believe that the bond is important because the

24    bond should be put in place to make certain that if the parties

25    that are enjoined, if you were to enjoin them, would be able to

1   go against the bond for any damages that they would suffer if

2   they are forbidden from proceeding in the action that they have

3   filed in Puerto Rico.  Excuse me one second, Judge.

4           Mr. Baralt is going to argue one other doctrine

5   about -- that goes along with the anti-injunction statute.

6           MR. BARALT:  Thank you, Your Honor.  Besides the

7   argument that Mr. Gilbert explained regarding the lack of

8   jurisdiction to issue an injunction under the AIA and the All

9   Writs Act, we believe that there are cases from the US Supreme

10  Court that also extend the *Younger* doctrine to civil cases.

11  The *Younger v. Harris* case from 1971 established an abstention

12  doctrine where federal courts should not enjoin criminal

13  proceedings in state courts.  The citation for that is 401 U.S.

14  37.  And there are three cases that have since extended that

15  doctrine to the civil litigation area.  So the argument is

16  that --

17          THE COURT:  What are the three cases?

18          MR. BARALT:  The three cases are *Pennzoil v. Texaco*,

19  481 U.S. 1; *Juidice v. Vail*, 430 U.S. 327; and *Sprint*

20  *Communications v. Jacobs*, 571 U.S. 584.

21          And the theory behind these holdings is besides

22  having an exception that you have to go through in the AIA to

23  enjoin state court litigation where the *Younger* abstention

24  doctrine applies, it creates a separate and independent barrier

25  to federal court injunctions of pending state court cases.

 1          And the idea where the *Younger* abstention would apply

 2   to civil cases in this scenario is that the -- specifically the

 3   *Sprint Communications* case that I cited states that there's a

 4   preclusion of federal intrusion in ongoing state proceedings

 5   where there's a matter pending before the state court involving

 6   certain orders that are uniquely in furtherance of the state

 7   court's ability to perform their judicial functions.

 8          And our argument would be that since in the

 9   Puerto Rico case there's already a case management order in

10   place that establishes the boundaries and deadlines for

11   discovery to occur, and that order already addresses the

12   sanctions that the Court would issue for violating it, there is

13   an interest of the Puerto Rico court to be able to enforce its

14   orders, to control the judicial processes, and that's the

15   reason why we believe, based on the case that I mentioned, the

16   *Younger* abstention doctrine is also a barrier to the injunction

17   that's been requested today.   Thanks.

18          MR. GILBERT:   And, Judge, so the only thing that I

19   would add, just pointing back to the *Atlantic Coastline* case

20   again, is that nothing should be done to enlarge by loose

21   statutory construction the three exceptions.   And the court

22   states, we conclude that the second exception implies something

23   similar to the concept of injunctions to protect or effectuate

24   judgments.   Both exceptions to the general prohibition of the

25   Anti-Injunction Act imply that some federal injunctive relief

1   may be necessary to prevent a state court from so interfering

2   with a federal court's consideration or disposition of a case

3   as to seriously impair the federal court's flexibility and

4   authority to decide the case.

5            But like in this case, as it was in the *Atlantic*

6   case, the court states, in short, the state court and federal

7   courts had concurrent jurisdiction in the case and neither

8   court was free to prevent either party from simultaneously

9   pursuing the claims in both courts.

10           There's nothing going on in the Puerto Rico case that

11  interferes with this Court's jurisdiction, absolutely nothing.

12  The court system was designed for concurrent jurisdiction, for

13  parallel cases to move on.  Nothing going on there that

14  prevents this Court from exercising its full jurisdiction.

15           One thing that I would like to point out, Judge, is

16  that I believe the temporary restraining order enjoined all

17  three of my defendant clients, Mr. Pintas individually, the P&M

18  Law Firm in Chicago, and the P&L Law Firm in Puerto Rico.  Only

19  the P&L Law Firm in Puerto Rico is a plaintiff in that case.

20  So I don't think that there needs to be any injunction

21  continued, period, but --

22           THE COURT:  Are you telling me that Mr. Pintas has

23  nothing to do with P&M Puerto Rico law firm?

24           MR. GILBERT:  No.  He absolutely does.  But he is not

25  a plaintiff in that lawsuit.

1              THE COURT:  I understand that.

2              MR. GILBERT:  He is not a plaintiff in that lawsuit.

3              And again, with respect to litigating hours away from

4    West Virginia, according to court dockets and searches and

5    whatnot, we understand that Plaintiff Mey has litigated in many

6    jurisdictions throughout the United States, including 39 cases

7    here in this district, but also in Michigan, in Florida, and

8    New York, and has pursued, at least from what we see, ten

9    appeals in different cases, so she's not new to litigating.

10             And again, any fear that they're putting in this

11   Court's mind or in their papers about the litigation that's

12   proceeding in Puerto Rico are totally unfounded.  She has

13   counsel there.  She is litigating there for over a year.  And

14   this Court -- there's nothing that's going on in that case that

15   interferes with this Court's jurisdiction.

16             THE COURT:  Tell me what minimum contacts Ms. Mey has

17   with Puerto Rico.

18             MR. GILBERT:  Judge, first I would say that that's

19   for the Puerto Rico court to decide.

20             THE COURT:  Well, that may be, but it's going to be

21   me deciding it today.

22             MR. GILBERT:  Well, we're not here to decide minimum

23   contacts in Puerto Rico.  But I will tell you that she placed

24   calls and sent demand letters to the law firm that was involved

25   in looking for clients to handle Camp Lejeune cases, and all of

1   that was generated out of Puerto Rico.

2          THE COURT:  What law firm?  I'm sorry.  What law

3   firm?

4          MR. GILBERT:  P&M Law Firm Puerto Rico.  Puerto Rico.

5   And that's a factual question, Judge, which this Court cannot

6   decide based upon what's happening in Puerto Rico.  This Court

7   cannot decide what minimum contacts are in Puerto Rico.

8          MR. BARALT:  Your Honor, I would like to add that

9   when the Puerto Rico court was faced with her argument that it

10  lacked minimum contacts, the Puerto Rico court gave us an

11  opportunity to have an evidentiary hearing, and she was going

12  to appear at that hearing, and the Court gave us both an

13  opportunity to decide that issue on January 24th.

14         But there was an agreement with the court by her

15  attorneys to simply reserve the jurisdictional defense and move

16  forward with the case and have an opportunity to answer the

17  complaint.  So it's not true the idea that the court declined

18  to rule on that issue already.  The court simply recognized her

19  right to reserve that defense, as anyone would have a right to

20  reserve a jurisdictional argument for any time throughout a

21  judicial process, even on appeal.

22         But the court gave us an opportunity, and after the

23  court entered its order, which is in my declaration,

24  summarizing agreement with her attorneys, they didn't appeal

25  that order either.  It was months after that they filed this

1   case.  So the court did give us an opportunity to have a final

2   resolution on whether we have minimum contacts or not.  It

3   wasn't the case, I just decline not to resolve that.

4         MR. GILBERT:  But, again, that's for the Puerto Rican

5   court to decide.

6         THE COURT:  Humor me.  You're telling me that the

7   phone calls were placed by the Puerto Rico law firm; is that

8   correct?

9         MR. GILBERT:  No.

10        THE COURT:  I'm sorry.  I misunderstood you then.

11        MR. GILBERT:  They work with callers that do that.

12   But when you talked about contacts in Puerto Rico, everything

13   that is alleged in this case was run out of the Puerto Rican

14   law firm, whether it was in negotiations with Ms. Mey or

15   whether it was retaining or hiring agents to pursue possible

16   candidates for claims at Camp Lejeune, but the lawsuit arose in

17   Puerto Rico as a result of a demand letter that Ms. Mey issued

18   seeking $130,000 in damages after she misled these callers by

19   creating a pseudonym of Rhonda Nicholson and making up an

20   address and making up a persona and a history, an identity and

21   whatnot, and the lawsuit was filed there for that --

22        THE COURT:  There's nothing in her email that

23   mentions anything about a Puerto Rican law firm, is there?

24        MR. GILBERT:  In her email?

25        THE COURT:  Yeah.  Her demand letter, as you call it.

1          MR. BARALT:  That's correct.  But our position, and

2    what we addressed at the stage where we were discussing her

3    motion to dismiss for minimum contacts, is that all of the

4    agents that were retained to pursue potential plaintiffs and

5    make the phone calls that she received, if it ends up being the

6    case that she received phone calls from them, and all the

7    efforts done by all of the Pintas parties to pursue those

8    plaintiffs were done by the Puerto Rico entity exclusively.

9    And the Chicago office and Mr. Pintas himself were not involved

10   in the efforts to find plaintiffs.  It was the Puerto Rico

11   entity that did that.

12         THE COURT:  So you're telling me that the law firm in

13   Puerto Rico authorized these agents to place illegal telephone

14   calls under the TCPA to people in the United States?

15         MR. GILBERT:  No, we're not telling you that, Judge.

16         THE COURT:  Tell me where am I wrong.

17         MR. GILBERT:  Because we're not agreeing to the fact

18   that they are illegal telephone calls.

19         THE COURT:  Okay.  But you authorized people to make

20   these telephone calls.

21         MR. GILBERT:  The law firm.

22         THE COURT:  The law firm in Puerto Rico.  I don't

23   mean you.

24         MR. GILBERT:  The law firm in Puerto Rico hired

25   callers to make these phone calls, yes.  Yes.  But we are not

1 saying that they're illegal.  As a matter of fact, I think the

2 Court is aware of the fact, because the plaintiff has appeared

3 in front of you before, from my understanding, we see Diana

4 Mey, the plaintiff, as not a consumer advocate necessarily but

5 as a professional plaintiff.  She knew exactly what she was

6 doing by creating the pseudonym, by using business operative

7 telephone systems, not residential phone systems, to entrap

8 these callers into pursuing.  She signed on.  She signed on to

9 the website to permit the callers to call her.

10          THE COURT:  That's after the first call.

11          MR. GILBERT:  We don't know that, Judge.  Those are

12 factual questions that belong in the purview of the Puerto

13 Rican court and have nothing to do with this Court's

14 jurisdiction.  If this Court moves forward concurrently, which

15 it can, obviously, then discovery will be had in this case,

16 just like discovery is ongoing in the Puerto Rico case.

17          But respectfully, Judge, this United States District

18 Court can't sit in judgment of the state court anywhere in the

19 United States, including its territory of Puerto Rico.  This

20 District Court doesn't have the authority to do that.  And

21 there are no cases that talk about Anti-Injunction Act and

22 drill down to what a factual determination may be by a Puerto

23 Rican court.  It doesn't rob this Court of jurisdiction.  It

24 doesn't harm this Court's jurisdiction.  There's no reason

25 whatsoever why the Puerto Rican court cannot continue, and

1   plaintiff may choose to file here instead of filing a

2   compulsory counterclaim.  That was her decision.  She proceeds

3   here.

4           But there is nothing in the law, Judge, nothing which

5   allows you at this point, which allows this Court,

6   respectfully, to say I'm enjoining the plaintiffs in

7   Puerto Rico because I don't trust what Puerto Rico's going to

8   do or I don't trust that the court in Puerto Rico is going to

9   be able to make a distinction on minimum contacts.  I don't

10  trust that court so I'm going to enter an injunction.  That is

11  not the law, Judge.  That's absolutely not the law.  And happy

12  to answer any other questions for you.

13          THE COURT:  Mr. Donovan.

14          MR. DONOVAN:  Yes, Your Honor.

15          THE COURT:  How long do you need for discovery?

16          MR. DONOVAN:  In this case?  Assuming they cooperate,

17  it could go pretty quickly.  My experience in these class

18  cases, as you've seen many times, is especially when it comes

19  to the issue of obtaining records of class phone calls, it can

20  take a little while, because we are often told that the records

21  are not within the possession, control, and custody of the

22  people who authorize the calls to be made and we have to issue

23  subpoenas to third parties.  They move to quash the subpoenas.

24          Reasonably, probably -- I'd like to say three or four

25  months, but probably I'd say reasonably six to eight months.

1   It takes a while in these cases, as you've seen.

2           Your Honor, I'll go fast, but there's a lot to

3   address there.  First of all, it's well within this Court's

4   jurisdiction in the context of the Anti-Injunction Act to take

5   evidence and make a finding as to the vexatious nature of the

6   Puerto Rican lawsuit.  Your determining, for the purpose of

7   deciding whether it's vexatious, that there was no jurisdiction

8   or that there was no factual basis, or anything else related to

9   that, is not an improper encroachment on the Puerto Rican

10  court's authority.  You're not deciding the Puerto Rican case

11  for it.  You're deciding it in the context of this case,

12  whether that case is vexatious.

13          And to that end, Your Honor, I said I looked forward

14  to hearing what my opposing counsel had to say about some of

15  those issues, and frankly, I heard nothing.  I heard that the

16  existence of the February 8 phone calls are a factual question.

17  Your Honor, I'd submit that they are an undisputed factual

18  question in this case.  We have submitted call records.  We are

19  submitting recordings of those calls.  All of the information

20  necessary to rebut that assertion is well within the

21  possession, control, and custody of the Pintas defendants, and

22  they have nothing.

23          Same goes for jurisdiction, Your Honor.  And I want

24  to point out kind of the sneaky way this was addressed in the

25  briefs.  We saw all these references in the briefs to

1    communications in February 2023, just generally, just generally

2    February 2023.  The fact that they -- the fact that the calls,

3    as the Court pointed out, occurred before any communication is

4    significant.

5              We also see an unsupported statement in the brief

6    that the email domain that Ms. Mey sent the demand letter -- as

7    they call it -- to included the Puerto Rican entity.  There's

8    no evidence of that.  Your Honor, I got on the website last

9    night and looked at it again, just to check, just to be sure

10   that something hadn't been changed.  She sent an email to the

11   P&M law firm, which if you go on their website, is a Chicago

12   law firm that operates in the United States.  It says nothing

13   about anything going on in Puerto Rico.

14             And the question of minimum contacts is looked at

15   from the perspective of the plaintiff.  Ms. Mey had absolutely

16   no reason to know, and there's no evidence to suggest she had

17   any reason to know, she was interacting with any Puerto Rican

18   entity whatsoever.  And there is no evidence in the record in

19   this case or the Puerto Rican case to suggest otherwise.

20             It's important to note that when she filed her motion

21   to dismiss in Puerto Rico, despite asking for several

22   extensions of time to produce evidence and affidavits, they

23   produced nothing.  The issues regarding Puerto Rico and the

24   Spanish pleadings in this case, I was kind of shocked to see

25   the way those were raised in the brief.  I think they were

1  certainly not consistent what we've said or anything the

2  Court's said.

3         No one's here to cast aspersions on the Puerto Rican

4  court or the Puerto Rican court system.  Diana Mey is

5  represented by a fine team of Puerto Rican lawyers, a very

6  expensive team of Puerto Rican lawyers, who are well respected

7  in that community, and they have just as much problem with

8  what's happened down there as anyone.

9         On the other hand, when Diana Mey filed her motion to

10  dismiss, putting the lie to the allegations in Pintas's

11  complaint in Puerto Rico, her lawyer withdrew.  I don't know

12  why he withdrew.  Maybe it was totally coincidental.  But

13  there's no attack on Puerto Rican courts.  And asking the Court

14  to enjoin this is not an attack or an affront to Puerto Rican

15  courts.  I think all the argument along those lines is entirely

16  improper.

17         I do want to address a couple factual issues,

18  additional ones, with this process server.  It was never

19  served.  We put out in our second brief in support of the

20  preliminary injunction some additional facts on that.  The

21  process server did come to Diana Mey's door with what she

22  described as a Spanish lawsuit.  Her husband knew nothing about

23  it, told him to get the hell out, and he did.  And that's when

24  she first drew the claim -- drew the connection to the email

25  she had previously received, and that's when I started calling

 1    frantically to the law firm in Puerto Rico.  Hey, I represent

 2    Diana Mey in West Virginia.  I'm not licensed in Puerto Rico.

 3    I don't want to go too far, but can you tell me what this is

 4    about.  Can you give me some information.  If they had,

 5    probably would have accepted service.  But I just kept getting

 6    put off and put off and my calls went unreturned.  The people

 7    said, well, I've got to talk to my boss before I can talk to

 8    you.  I can't tell you anything about this case.  I can't give

 9    you a copy of it in English, which we now know from their

10    appendix they had all along.

11          The reason for that is that while I'm making these

12    frantic calls trying to figure out what's going on, they're

13    getting a default judgment.  And getting that default judgment

14    and hiding it from us is why Ms. Mey could not remove this case

15    to federal court.  It's -- she couldn't make these -- if she

16    had made these compulsory counterclaims they are saying she

17    should have made, she would have been subjecting herself to the

18    jurisdiction of the Puerto Rican court in an effort to defend

19    cases where there's no jurisdiction to start with in the first

20    place, so they're not compulsory counterclaims.  That's crazy.

21          With respect to some of the legal argument we saw

22    here, to claim that a federal court has no authority to enjoin

23    a state court under these circumstances is to completely ignore

24    the plain language of the Anti-Injunction Act.  What do we

25    start with?  We start with the text and the purpose.  The text

1  says you can enjoin a state court proceeding in aid of your

2  jurisdiction when the state court threatens to deprive this

3  court of the authority or flexibility to resolve a federal

4  claim.  Plain language.  There is no dispute that this case and

5  the injunction we're seeking falls within that exception to the

6  Anti-Injunction Act.

7           Now, there are cases.  We heard about the *Atlantic*

8  *Coast* case law.  We cited that.  The *Atlantic Coast* case

9  says -- and I think we all agree on this -- that you shouldn't

10 expand that exception with a loose statutory construction, in

11 the interest of comity.  That's the purpose for that, in the

12 interest of comity with the state courts.  And the *Baldwin* case

13 from the Second Circuit that we've cited and that the Court

14 relied on in the TRO order says when you have a lawsuit that is

15 patently vexatious, as I would submit there is no other way to

16 view this case filed by Mr. Pintas in Puerto Rico, all those

17 concerns about comity go out the window.  You don't owe any

18 principle of comity to a vexatious lawsuit.

19          In addition, opposing counsel read to us from all

20 sorts of cases.  We pointed this out in our reply brief.  All

21 of those cases involve the necessary-to-effectuate-a-judgment

22 exception to the Anti-Injunction Act.  And they are, whether

23 purposefully or not, conflating that exception to the

24 Anti-Injunction Act, under which we are not moving, with the

25 in-aid-of-jurisdiction exception under which we are moving.

1          And the reason for that is that obviously if you're

2    moving under the exception that allows the Court to protect or

3    enforce its judgment, then there's got to be a judgment.  As

4    they say, we don't have a judgment in this case, there's

5    nothing to protect or enforce.  We're not moving under that

6    exception.  None of those cases have any application to this

7    case whatsoever.

8          What we do see, the cases that do have a lot of

9    application to this case, are the cases involving complex

10   litigation in federal court that's threatened by, underlined,

11   vexatious lawsuits in a state court.  It's important to -- this

12   is not just Diana Mey's case.  This isn't an MDL.  But the same

13   principles apply, because what's at stake in this case is not

14   just this Court's authority to resolve Diana Mey's individual

15   claim against Pintas and the Pintas defendants, but the claims

16   of untold thousands or tens of thousands of other class members

17   who will have the same claim, whose claims are also threatened

18   by this vexatious litigation.  And that's the point, Your

19   Honor.  You strip away everything else from this case, all you

20   have to do is apply a little bit of common sense to see what's

21   going on here.

22          These defendants don't like it when plaintiffs sue

23   them.  I understand that.  No one wants to be sued.  Under the

24   TCPA, Congress has authorized people like Diana Mey to act as

25   these private attorneys general.  That's the only way the TCPA

1   is enforced.  And it's a tough statute.  It's strict liability.

2   And people violate it with impunity, and when they do, it

3   hurts.  And as a result, having failed -- we just -- there was

4   an admission in court earlier today, I think a pretty startling

5   admission, about agency in this case, which is usually one of

6   the biggest issues.

7          So we've got an issue -- we've got a case here that's

8   going to proceed, and it's probably going to cost Pintas a lot

9   of money, and so what does he do?  Let's fight the plaintiffs.

10  Diana Mey has been countersued in Montana -- Idaho, I guess.

11  She's been accused of being a professional plaintiff.  Over and

12  over again we've been able to defeat those attacks on her,

13  because once those attacks work, TCPA advocacy is gone.

14         If someone like Pintas can respond to a demand letter

15  with a vexatious and false -- indisputably false.  They don't

16  dispute those facts today -- lawsuit in Puerto Rico or

17  anywhere, it would be -- they talk about Ms. Mey litigating

18  cases all over the country.  The Puerto Rican elements of this

19  case, the fact that they served her in a Spanish newspaper, in

20  Spanish, all those issues, those are -- that's evidence that

21  supports a finding that the underlying lawsuit is vexatious,

22  but it's not dispositive.

23         It would be no different if Mr. Pintas had gone off

24  and filed a false and vexatious lawsuit totally lacking

25  jurisdiction in Ohio.  It might be a little harder to prove

1    that it was vexatious, pretty easy to do so in this case, but

2    this Puerto Rican issue is a total red herring.

3            Bottom line, Your Honor, this Court absolutely has

4    the authority to enter the injunction, to make the same

5    findings that it made in its TRO order.  I haven't heard

6    anything today that changes anything that the Court found or

7    concluded in the TRO order.  They talk about these -- they say

8    typically this happens, ordinarily this happens.  Thank god

9    this is not an ordinary case, but in those cases where the

10   facts are closest to this, courts have entered injunctions, and

11   those injunctions have been upheld under an abuse of discretion

12   standard.

13           I do briefly just want to mention the issue of a

14   bond, if the Court is to enter an injunction.  This is in our

15   reply.

16           THE COURT:  I got it.

17           MR. DONOVAN:  Okay.  Very good.  Anything else, Your

18   Honor?

19           THE COURT:  No.

20           MR. GILBERT:  If I may, Your Honor, I would just --

21   what Mr. Donovan just mentioned, I would assume that he's never

22   been in federal court enjoining a state court before on

23   these -- in these circumstances; otherwise, he would have told

24   us about it, and that's exactly the point.  If this case had

25   been filed in Illinois, where the Chicago law firm is, or

1    whatever, he wouldn't be in federal court seeking an injunction

2    to prevent the Illinois case from going forward.

3              THE COURT:  No, because she would have been served in

4    English.  There wouldn't have been a default judgment.  She

5    could have removed to federal court and everybody would have

6    been happy.

7              MR. GILBERT:  I can tell you, Judge, that in -- so I

8    can tell you that there are many summonses issued in this

9    United States of America that are issued in English and Spanish

10   and Creole and Haitian and whatnot.  That is exactly the point.

11   He's telling you that he's not injecting fear into this Court

12   by saying that the summons was in Spanish.  That is allowed,

13   Judge.  That is allowed in the United States.

14             And like I said, if we had filed in Illinois or Ohio

15   or West Virginia or whatever the case may be, there would be no

16   coming into this court seeking to enjoin another state court

17   anywhere here in the United States except for the fear that

18   he's putting into this Court with respect to that.

19             Additionally, Judge, the Anti-Injunction Act has not

20   been changed in more than 200-plus years, so there should be no

21   additional reading into it.  And again, there's nothing going

22   on in Puerto Rico that zaps the jurisdiction of this Court from

23   you.

24             And with respect to February 8 -- and I don't think

25   that we need to get in the facts, because we're not trying the

1   facts at this point, but if she got a call on February 8 or got

2   a text on February 8, it could have been shut down immediately

3   by saying, I'm on the do-not-call list.  Please don't call me

4   again.  And that would have been it.  But she created the

5   pseudonym, false identity, false address, false story, and

6   perpetuated 16 or 19 more calls so that she could end up making

7   a almost extorting demand from our clients for $130,000, when

8   she could have hung up the phone and said, I'm on the

9   do-not-call list, if, in fact, that call was made.

10          The lawsuit in Puerto Rico is not vexatious or

11   frivolous, and this Court, respectfully, does not have the

12   jurisdiction to enjoin it from going forward.  Thank you,

13   Judge.

14          THE COURT:  I will issue a decision within the next

15   couple days.

16          MR. DONOVAN:  On that issue, Your Honor, I probably

17   don't have to remind you about this, but I would kick myself if

18   I didn't.  I do think the TRO expires after 14 days, so we

19   would suggest finding of good cause to extend that until the

20   Court can issue an order on the preliminary injunction.

21   Arguably expires after 14 days.  I don't know whether -- our

22   position is we're not under Rule 65, but I think it would be

23   better to be safe than sorry.

24          THE COURT:  All right.  I will extend it for an

25   additional 14 days on the reasons that time is running out and

1    this Court needs a couple of days.  It's not going to be 14

2    days, but it needs a couple of days to put an order together.

3              MR. GILBERT:  Thank you, Judge.

4              THE COURT:  Thank you.

5              MR. DONOVAN:  Your Honor, may I submit this?

6              THE COURT:  You may.

7              (Proceedings concluded at 10:58 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2        I, Cindy L. Knecht, Registered Professional Reporter and

 3   Official Reporter of the United States District Court for the

 4   Northern District of West Virginia, do hereby certify that the

 5   foregoing is a true and correct transcript of the proceedings

 6   had in the above-styled action on May 13, 2024, as reported by

 7   me in stenotypy.

 8        I certify that the transcript fees and format comply with

 9   those prescribed by the Court and the Judicial Conference of

10   the United States.

11        Given under my hand this 15th day of May 2024.

12                    /s/Cindy L. Knecht
                    _____
13                    Cindy L. Knecht, RMR/CRR
                    Official reporter, United States
14                    District Court for the Northern
                    District of West Virginia
15

16

17

18

19

20

21

22

23

24

25
```